[L. A. No. 7152.    In Bank.—December 5, 1923.]

## CALIFORNIA PRESS MANUFACTURING COMPANY (a Corporation), etc., Appellant, v. STAFFORD PACKING COMPANY (a Corporation), Respondent.

[1] SALES—CAPACITY OF MACHINE—BREACH OF WARRANTY—DAMAGES — PROSPECTIVE PROFITS. — Prospective profits claimed by a buyer of a machine for the reduction of fish offal into fishmeal and fish oil, which was warranted to have a given capacity per hour, and which did convert all of the fish offal the buyer could produce and did so by working less than half time, are too remote and speculative to be recoverable on the theory that the buyer could have purchased more fish in the open market; that if it had done so and packed more fish it could have produced more offal, and therefore, if the machinery had been capable of converting it into meal and oil, the buyer would have made more money.

[2] DAMAGES—EXTENT OF RECOVERY OF.—The damages that can be recovered for any breach of contract are only such as may reason-

ably be supposed to have been in the contemplation of the parties at the time of entering into the agreement, as the probable result of a breach. Other damages are too remote.

[3] ID.—CONTEMPLATION OF PARTIES — INTENTION — CONSTRUCTION.— The rule which allows the recovery of only such damages as may reasonably be supposed to have been in the contemplation of the parties at the time of entering into the contract does not mean that the parties should actually have contemplated the very consequence that occurred, but simply that the consequence for which compensation is sought must be such as the parties may be reasonably supposed, in the light of all the facts known, or which should have been known to them, to have considered as likely to follow in the ordinary course of things, from a breach, and, therefore, to have in effect stipulated against. The understanding and intention of the parties in this regard must be ascertained from the language of the contract, in the light of such facts.

[4] ID.—UNESTABLISHED BUSINESS—LOSS OF PROFITS.—Loss of profits growing out of a breach of contract, and resulting to an unestablished business, is of too uncertain a character to constitute a basis for the computation of damages for the breach.

[5] ID.—NEW BUSINESS — LOSS OF PROFITS — SPECULATIVE CHARACTER OF.—Where a new business or enterprise is engaged in, and damages by way of profits are sought for its interruption or prevention, the rule is that they will be denied for the reason that such business and its profits are speculative and remote, existing only in anticipation.

[6] ID.—ANTICIPATED PROFITS—ABSENCE OF BASIS FOR COMPUTATION OF.—If one engages in a new industry, there are no provable data of past business from which the fact can be legally deduced that anticipated profits would have been realized.

[7] ID. — COMPUTATION OF LOSS — CERTAINTY. — It is the general rule that, as between possible methods by which a loss may be computed, the law prefers that which leads to certain, and not speculative, results.

[8] SALES—BREACH OF WARRANTY—DAMAGES.—The damage to be recovered for not supplying a machine or other article, as agreed, is usually the market value for which another may be procured, and is not to be founded upon the uncertain and speculative basis of the profit which might have been made from its use.

[9] ID.—WARRANTY—WAIVER—ESTOPPEL—EVIDENCE.—The buyer of a fish offal reducing machine waived any claim for damages he

---

8. Loss of profits as element of damages for breach of warranty, note, 52 L. R. A. 233, 240.

Loss of profits in case of breach of warranty of machinery purchased for vendee's use, note, 2 B. R. C. 83.

might have had by reason of the machine not having the capacity warranted by the seller, where the buyer, after the machine failed to perform in accordance with the warranty, secured a modification of the terms of payment of the machine, caused the seller to expend the sum of fifteen hundred dollars making a certain installation, upon the promise that he would accept the machine, and did accept the machine after installation; and such buyer was thereby estopped from asserting a claim for damages for breach of said warranty in an action by the seller for claim and delivery of the machine.

APPEAL from a judgment of the Superior Court of Los Angeles County.   Charles Monroe, Judge.   Reversed.

The facts are stated in the opinion of the court.

S. W. Molkenbuhr and Porter & Sutton for Appellant.

W. A. Alderson for Respondent.

WASTE, J.—The plaintiff sold and delivered to the defendant, under a conditional sales contract, a fishmeal machine or plant, for an agreed sum of $8,000. On the refusal of the defendant to pay a trade acceptance for the amount of the final installment due on the purchase price, plaintiff instituted an action in claim and delivery to recover possession of the machinery. The complaint was in the usual form for actions of this character. The defendant answered, denying plaintiff's right to possession, and, at the same time, filed a cross-complaint alleging a breach of warranty on plaintiff's part in failing to furnish a machine having an agreed capacity, and sought damages for the alleged loss of prospective profits which would have been realized had the machine been as warranted. Plaintiff answered the cross-complaint, denying the alleged breach of warranty, and any loss of profits, and, as an affirmative defense, pleaded a waiver by defendant. The trial court ordered, and the jury returned, a verdict in favor of the Press Company for the return of the fishmeal machine and, in case delivery could not be had, then for the value thereof. The jury also returned a verdict in favor of the Packing Company under its cross-complaint for the sum of $1,000 damages for loss of prospective profits. Plaintiff in due course moved for a new trial, and this being denied, it has

appealed from that portion of the judgment awarding damages to the defendant. Its contentions are that damage resulting from the loss of expected, future, or prospective profits was not within the contemplation of the parties when the contract was entered into in this case, and that any such expected profits claimed by respondent are too dependent upon numerous, uncertain, and changing contingencies to afford a trustworthy and definite measure of damages, and are likewise speculative, remote, and not the direct and immediate result of the nonfulfillment of the contract.

The appellant was the sole manufacturer of a large machine and accessory equipment by means of which machine or device fish canners are able, by a continuous process, to reduce fish offal or cannery waste into fishmeal and fish oil, useful for fertilizer and other purposes, and for animal consumption. The respondent Packing Company negotiated with the predecessors of the appellant for the purchase of a plant to cost, when set up and in operation, the sum of $8,000. These negotiations resulted in the execution of a written contract, by the terms of which appellant agreed to furnish "One Continuous Fishmeal Plant, having a capacity of two and one-quarter (2¼) tons of raw material per hour." The contract contained a guaranty that the machinery furnished would be of standard quality and that any parts developing mechanical defects within thirty days from the time machinery was put in operation would be replaced by the seller at its own expense. When the plant was set up and in operation it did not have the capacity to reduce two and one-quarter tons of raw material per hour. There was considerable correspondence between respondent and the appellant concerning the operation of the plant. Numerous inspections were made by appellant's employees and experts in an endeavor to increase the capacity of the plant. A number of adjustments and replacements were made, which "brought the plant somewhere near the capacity we [respondent] desired." As a result, respondent agreed to accept the plant, provided the appellant would install an additional drum on the drier, and would agree to put forth its best efforts to increase and better the performance of the machine. This arrangement was agreeable to appellant, which also, at the request of the respondent, agreed to a modification of the terms of payment for the

plant. The changes in installation were made, and respondent continued to use the machine as before. It made two payments on the unpaid purchase price under the modified terms of the agreement, but failed to honor a trade acceptance for the balance, and this action resulted.

The respondent attempts to justify its claim for loss of profits "solely because of the breach of appellant's warranty, and the loss to respondent directly by failure of the fishmeal machine to consume to the capacity warranted by appellant, thereby causing the respondent to lose the difference between what the fishmeal machine would have produced, if it had performed in compliance with the warranty, and what it actually produced." It relies upon the language of the contract by which appellant proposed to furnish "One Continuous Fishmeal Plant, having a capacity of two and one-quarter ($2\frac{1}{4}$) tons of raw material per hour." Assuming that both of the parties to the transaction may have contemplated that the Packing Company would make a profit from the manufacture and sale of the by-products of its fish business, and that this case on the facts thus far related might fall within the reasoning of *Shoemaker* v. *Acker*, 116 Cal. 239 [48 Pac. 62], other facts differentiate it from the situation there considered. [1] It is clearly established by the evidence that the machinery installed by appellant did actually convert all of the fish offal which the respondent could produce, and did so by working less than half time. Respondent's theory is, however, that it could have purchased more fish in the open market; that if it had done so and packed more fish it could have produced more offal, and therefore, if the machinery had been capable of converting it into meal and oil, respondent would have made more money. It is at once clear that the prospective profits claimed by respondent are too remote and speculative to be recoverable.

[2] It is a well-settled rule that the damages that can be recovered for any breach of contract are only such as may reasonably be supposed to have been in the contemplation of the parties at the time of entering into the agreement, as the probable result of a breach. "Other damages are too remote. [3] . . . This rule does not mean that the parties should actually have contemplated the very consequence that occurred, but simply that the consequence for

which compensation is sought, must be such as the parties may be reasonably supposed, in the light ·of all the facts known, or which should have been known to them, to have considered as likely to follow in the ordinary course of things, from a breach,˙ and, therefore, to have in effect stipulated against. The understanding and intention of the parties in this regard must of course be ascertained from the language of the contract, in the light of such facts.'' (*Hunt Bros. Co.* v. *San Lorenzo Water Co.,* 150 Cal. 51, 56 [7 L. R. A. (N. S.), 913, 87 Pac. 1093, 1095].) The president of the respondent company testified that, at the time the contract was signed, all that was said by either of the parties was that he told Mr. Meakin, the inventor of the fishmeal machine and president of the appellant company, that respondent wanted a machine which it ''could use for making fishmeal out of scrap and fish in general,'' and ''he said he was going to give us a machine for such purpose.'' Meakin testified that at the time the contract was entered into he knew the purpose for which the respondent wanted the machine and for which it was to be used by the Packing Company. No testimony was introduced showing that there were any special circumstances surrounding the execution of the contract whereby appellant engaged itself to assume a loss for prospective profits, or to have warranted respondent in reasonably supposing that it would assume the same. The contract itself contains no stipulation to pay for ''prospective profits.''

Another element enters into the consideration. At the time the parties were negotiating for the sale and purchase of the fishmeal plant in this case, the respondent had not theretofore engaged in the conversion of its fish offal or cannery waste into fishmeal. It therefore had no experience in the operation of any such plant as it contemplated purchasing. So far as it was concerned, the enterprise was a new undertaking and engaging in a new industry. The reduction of cannery by-products into fishmeal and fish oil by appellant's process was an entirely new industry invented by the president of the appellant corporation. It would appear unlikely, therefore, that either the appellant or the respondent had in contemplation a warranty by the appellant sufficient to cover anticipated profits which the respondent might realize had the machine the capacity called

for by the contract. **[4]** As a proposition of law, it is well established that loss of profits growing out of a breach of contract, and resulting to an unestablished business, is of too uncertain a character to constitute a basis for the computation of damages for the breach. (*Kettering* v. *Sheppard,* 19 N. M. 330 [142 Pac. 1128].) **[5]** Where a new business or enterprise is engaged in, and damages by way of profits are sought for its interruption or prevention, the rule is that they will be denied, for the reason that such business is an adventure as distinguished from an established business, and its profits are speculative and remote, existing only in anticipation. (17 Cor. Jur., p. 797, sec. 118; *Shoemaker* v. *Acker,* 116 Cal. 239, 244 [48 Pac. 62].) The rule is one of necessity. Damages must be certain of ascertainment. **[6]** If one engages in a new industry, there are no provable data of past business from which the fact can be legally deduced that anticipated profits would have been realized. (*Central Coal Co.* v. *Hartman,* 111 Fed. 96, 99 [49 C. C. A. 244].)

**[7]** Aside from these considerations, the general rule is that, as between possible methods by which a loss may be computed, the law prefers that which leads to certain, and not speculative, results. **[8]** The damage to be recovered for not supplying a machine or other article, as agreed, is usually the market value for which another may be procured, and is not to be founded upon the uncertain and speculative basis of the profit which might have been made from its use. (2 Mechem on Sales, sec. 1779.) The great weight of authority seems to be that the recovery of profits is possible only under exceptional circumstances, unless the engagement by its very terms discloses them to have been in effect, in whole or in part, a subject matter of the contract. (*Pusey & Jones Co.* v. *Combined Locks Paper Co.,* 255 Fed. 700, 705.) The grounds upon which rest the general rule of excluding profits in estimating damages are concisely stated in *Howard* v. *Stillwell & Bierce Mfg. Co.,* 139 U. S. 199 [35 L. Ed. 147, 11 Sup. Ct. Rep. 500, see, also, Rose's U. S. Notes], a case almost identical with the one here. Damages were there sought to be recovered for loss of profits due to the failure to construct a flour-mill within a certain period and with a given capacity per hour. The court gave three reasons for excluding profits (p. 206):

"(1) that in the greater number of cases such expected profits are too dependent upon numerous, uncertain and changing contingencies to constitute a definite and trustworthy measure of actual damages; (2) because such loss of profit is ordinarily remote, and not, as a matter of course, the direct and immediate result of the nonfulfillment of the contract; (3) and because most frequently the engagement to pay such loss of profits, in case of default in the performance, is not a part of the contract itself, nor can it be implied from its nature and terms (citing cases)." (See, also, *Globe Refining Co.* v. *Landa Cotton Oil Co.,* 190 U. S. 540 [47 L. Ed. 1171, 23 Sup. Ct. Rep. 754, see, also, Rose's U. S. Notes].) The subject was reviewed by another court in a case involving a sale of flour-mill machinery, the contract for which warranted the machinery to have a capacity of a certain number of barrels per day, and it failed to measure up to the stipulated capacity. Damages were sought for loss of profits "which might have been made." The court held it was no part of the contract that the plaintiff should make profits by carrying on a business with the machinery which the defendant agreed to erect. It distinguished the transaction from a sale of chattels or of land in which the possible profit is the very object of the contract and is necessarily in the contemplation of the parties, saying: "When a machinist furnishes machinery to a mill owner it is no part of his engagement that a profitable business shall be carried on with the machinery furnished. Of course if it is defective he is responsible for the damage resulting directly from such defect; but that is a very different thing from the uncertain, remote and speculative profits which may or may not be made in the business to be done." (*Pennypacker* v. *Jones,* 106 Pa. St. 237, 242.)

It is therefore manifest, from these authorities, that the issue as to prospective profits advanced by the respondent in this case was improperly submitted to the jury. The cases cited by respondent in support of its claim for such profits lose persuasive force when applied to a situation like that we are now considering. They relate to such other and different facts as to be readily distinguishable, and do not in the least militate against the rule preventing a recovery of prospective profits not in the contemplation of the par-

ties, or of profits "which might have been earned" in a new and untried industry.

For another reason, respondent should not be allowed to recover damages in this case. In its answer to the cross-complaint, certain acts on the part of the respondent were pleaded by the appellant as amounting to a waiver and as an estoppel. It was clearly proved that some time after the plant was in operation, during a conference between the presidents of the two companies, Mr. Stafford, president of the respondent, said he was satisfied with the cooker and press connected with the plant, but complained that the capacity of the drier was not two and one-quarter tons. He proposed that appellant install an additional drum on the drier, on which being done, "he felt sure the plant would be satisfactory, and he would accept it." The additional drum was thereupon installed by appellant at a cost of $1,500. The Packing Company thereafter wrote a letter to appellant in which, after discussing certain tests of the plant, it said: "The last changes you have made have brought the plant somewhere near the capacity we desired, and we are not going to insist on a rigid adherence to your guarantee." It expressed itself as thoroughly satisfied with the performance of the drier, while still of the conviction that it was impossible to make the cooker and press, in its then condition, do the required amount of work. It suggested that appellant might be able to make certain improvements or adjustments which would accomplish the desired results, and agreed to accept the plant if appellant would agree to put forth its "best efforts to increase and better the performance of the cooker 'and press assembly," and provided appellant would deviate slightly from the terms of the contract in the matter of making final settlement. This proposal was agreed to by the appellant. Later, the respondent in writing repeated the substance of this offer which, it stated, "was that we would accept the plant and trust that you will see that this plant does deliver two and one-quarter tons per hour." It renewed its offer to give trade acceptances for the balance of the purchase price, and requested that the time for payment of the same be extended until it could get returns from its tuna packing season. Its offer being agreeable to appellant, respondent executed and mailed to the Press Company for signature three trade acceptances, two for

$1,000 each, due July and August following, respectively, and the third for the balance of $1,238.50, due in September. The first two trade acceptances were paid without further protest when due. During all of this time the respondent used the fishmeal machine in connection with the operation of its plant.

[9] The foregoing facts are established without contradiction. There is some dispute in the evidence as to what the appellant did on its part to increase the output of the machine. But, from the facts proven, it must be held that the respondent did not insist, but, on the contrary, waived a rigid adherence to any guarantee on the part of appellant as to the amount of the output of the machine. The facts proven present a clear and complete defense to the claim for damages for the breach of the warranty as to capacity. By causing appellant to expend the sum of $1,500 in installing a new drum, upon the promise that respondent would accept the machine, and by accepting the plant in the condition in which it was after its installation, and securing at the time an extension of. the period for making final payments, respondent must be held to have waived any right to claim damages by reason of the failure of the machine to measure up to capacity, and is now estopped from asserting any such demand in this action.

The conclusion we have reached renders it unnecessary to attempt to analyze the testimony in what we think would be a vain endeavor to determine the method by which the jury arrived at the sum of $1,000 as the amount of the prospective profits lost by the respondent. It also becomes unnecessary to consider the contention of the appellant that the trial court committed error in admitting in evidence the "Cost Book" of the respondent, in order to determine the physical and actual capacity of the plant per hour, in the absence of any witness being called to testify or identify slips and memoranda which were copied into the book.

The judgment appealed from is reversed.

Myers, J., Kerrigan, J., Lawlor, J., Lennon, J., Seawell, J., and Wilbur, C. J. concurred.